# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 15-60431

United States Court of Appeals
Fifth Circuit

**FILED**

August 4, 2016

Lyle W. Cayce
Clerk

RICHARD L. BOETA,

  Petitioner

v.

FEDERAL AVIATION ADMINISTRATION,

  Respondent

Appeal from the Decision of the
National Transportation Safety Board

Before JONES, WIENER, and HIGGINSON, Circuit Judges.

WIENER, Circuit Judge:

Petitioner Richard Boeta appeals the final decision of the National Transportation Safety Board ("NTSB"), affirming the initial decision of an Administrative Law Judge ("ALJ") which upheld the Federal Aviation Administration's ("FAA") sixty days suspension of Boeta's air transport pilot certificate. For the reasons hereafter set forth, we (1) grant Boeta's petition for review of the NTSB's final decision; (2) reverse that decision with respect to Boeta's waiver-of-sanction defense; (3) vacate the FAA's sixty days suspension of his air transport pilot certificate; and (4) remand for further disposition and completion of this matter by the NTSB and the FAA, consistent herewith.

No. 15-60431

## I.

## A.

The appealed ruling of the ALJ that affirmed the FAA's order suspending Boeta's air transport pilot certificate resulted from the flight of a small, twin-engine jet aircraft ("N497RC") that Boeta occasionally piloted. At all relevant times, Redi-Carpet Properties, LLC ("Redi-Carpet") owned N497RC and Capital Aerospace, LLC ("Capital") managed it. At no time did either Redi-Carpet or Capital have a certificate under 14 C.F.R. part 119, without which Redi-Carpet was restricted to operating N497RC under 14 C.F.R. part 91, noncommercially, for its or its lessee's own use.[1] Redi-Carpet only did so through Capital, which served as its agent. Under this arrangement, Redi-Carpet, through Capital, had possession of and "operational control"—*viz.*, the "exercise of authority over initiating, conducting or terminating a flight"—over N497RC as its owner.[2] Boeta, who was employed by Capital, was thus an agent of both Capital and Redi-Carpet.

Redi-Carpet could also transfer its possession and operational control of N497RC to another entity through a "dry lease" agreement, under which the lessor provides an aircraft to a lessee without furnishing the pilot or any other crew members.[3] During the course of a dry lease, Redi-Carpet, as lessor, would

---

[1] In this context, an aircraft is operated "commercially" only when it is used in *air commerce*. For instance, when "conducting passenger-carrying flights for compensation or hire." 14 C.F.R. § 91.147; *see* 14 C.F.R. § 1.1 ("Commercial operator means a person who, for compensation or hire, engages in the carriage by aircraft in air commerce of persons or property . . . . Where it is doubtful that an operation is for 'compensation or hire', the test applied is whether the carriage by air is merely incidental to the person's other business or is, in itself, a major enterprise for profit.").

[2] 14 C.F.R. § 1.1.

[3] Truth in Leasing, FAA Advisory Circular No. 91-37A (1978), http://www.faa.gov/documentLibrary/media/Advisory_Circular/AC%2091-37A.pdf; *see* Legal Interpretation to Eric L. Johnson, from Rebecca B. MacPherson, Assistant.Chief Counsel

relinquish—and the other entity, as lessee, would assume—possession and operational control of N497RC. Capital would then operate N497RC as that lessee's agent.

In 2009, Capital and Redi-Carpet agreed that Capital would obtain a certificate under part 119 so that Capital could operate N497RC commercially, for the benefit of other entities apart from Redi-Carpet or its lessees, under part 135. Once Capital obtained that certificate, Redi-Carpet planned to transfer possession and operational control of N497RC to Capital through a dry lease agreement,[4] and Capital would then act as N497RC's "operator" in its own right, not merely as Redi-Carpet's agent.

To obtain its certificate under part 119, Capital entered into an agreement with USAC Airways ("USAC"). USAC was to consult with Capital during the term of that agreement. To facilitate this arrangement, Redi-Carpet transferred possession of and operational control over N497RC to USAC under a separate dry lease agreement. This dry lease agreement stated that "[USAC] shall have full and exclusive operational control, as well as possession, command and control of [N497RC]" and "shall have full and final authority over the dispatch and conduct of flights in [N497RC], except for safety or flight issues, over which such issues the Pilot-in-Command shall have full and final authority."

To operate a flight commercially under part 135, the operator must not only have a certificate under part 119, but must have operations specifications

---

for Regulations (Aug. 11, 2011), http://www.faa.gov/about/office_org/ headquarters_offices/agc/pol_adjudication/agc200/interpretations/data/interps/2011/johnson -johnson%20-%20%282011%29%20legal%20interpretation.pdf.

[4] Capital could operate N497RC noncommercially for Capital's own use under part 91 because it would have taken possession of it through the dry lease. Stated differently, Capital would have assumed the rights and obligations of Redi-Carpet, the owner.

No. 15-60431

("OpSpecs") as well.[5] OpSpecs are issued by the FAA and "prescribe [the operator's] authorizations, limitations, and procedures,"[6] including the "[t]ype of aircraft, registration markings, and serial numbers of each aircraft authorized for use."[7]

After entering the dry lease with Redi-Carpet, USAC requested that the FAA amend USAC's existing OpSpecs to include N497RC, after which USAC would be authorized to operate N497RC commercially under part 135. Although Boeta remained Capital's employee throughout, he also became USAC's agent during this transition and was allowed to operate N497RC as its agent.[8]

USAC also obtained FAA authorization to operate N497RC in reduced vertical separation ("RVSM") airspace, in which air traffic control ("ATC") reduces the minimum vertical separation between aircraft from 2,000 to 1,000 feet.[9] To obtain such authorization, the operator must implement specified maintenance and training procedures which ensure that its aircraft and its pilots will operate safely in RVSM airspace.[10] It also must demonstrate that

---

[5] 14 C.F.R. § 119.33(a), (b).

[6] *Id.*

[7] 14 C.F.R. § 119.49(a)(4).

[8] USAC's operation manual states: "All crewmembers are direct employees or agents for all aspects of Part 135 operations." Likewise, its OpSpecs provide: "The significance of the words 'agent' and 'agents' as used in these operations specifications is that the certificate holder is the principal and that the certificate holder is accountable and liable for the acts or omissions of each of its agent or agents."

[9] Authorization of Aircraft and Operators for Flight in Reduced Vertical Separation Minimum Airspace, FAA Advisory Circular No. 91-85 (2009); *see* 14 C.F.R. pt. 91, app. G. ("Within RVSM airspace, air traffic control (ATC) separates aircraft by a minimum of 1,000 feet vertically between flight level (FL) 290 and FL 410 inclusive.").

[10] 14 C.F.R. pt. 91, app. G.

4

its aircraft meets specified standards. Since USAC already held a certificate under part 119, its authority to operate N497RC in RVSM airspace was included in its OpSpecs. (If it had not had such a certificate in its Op Specs, that authority could have been included in a letter of authorization ("LOA")).[11]

USAC, which had operational control of N497RC during its dry lease from Redi-Carpet, dispatched all flights on N497RC through a computer-generated flight dispatch sheet. At the ALJ's hearing, USAC's chief pilot stated that Boeta and all other pilots at USAC "had gone through our training program so they understood about operational control and all the aspects of setting up a flight, conducting a flight, terminating a flight, and who has operational control. They understood the importance of a dispatch sheet."

By 2011, USAC had apparently become concerned that it was "losing operation control" of N497RC. As a result, USAC gave oral notice to Capital that it was terminating their agreement. (It does not appear, however, that USAC gave notice to Redi-Carpet that it was terminating their seperate dry lease agreement, although that seems to have been USAC's intention.) USAC dispatched its last flight for Capital in March 2011. In May, USAC requested that the FAA amend its OpSpecs to remove N497RC. In so doing, USAC surrendered its authorization to operate N497RC in RVSM airspace.

Capital, which had no part 119 certificate, was not authorized to operate commercially under part 135. Instead, it operated N497RC as it had prior to its agreement with USAC—*viz.*, as Redi-Carpet's or its lessee's agent.

Even though the agreement between Capital and USAC had terminated (and the dry lease between Redi-Carpet and USAC had presumably terminated as well), the agency relationship between Boeta and USAC continued. No one

---

[11] 14 C.F.R. pt. 91, app. G, sec. 3.

at USAC ever spoke with or wrote to Boeta about that. Neither did USAC notify Boeta that operational control of N497RC had shifted away from USAC or that USAC was no longer authorized by the FAA to operate N497RC because USAC's OpSpecs had been amended. However, Boeta ceased receiving USAC's dispatch sheets and instead began receiving Capital's trip sheets. This could have—and probably should have—indicated to him that USAC no longer had possession of or operational control over N497RC.

In September 2011—four months after USAC had the FAA remove N497RC from its OpSpecs—Boeta received a trip sheet from Capital, instructing him to pilot N497RC from Sugar Land, Texas, to Palm Beach, Florida. Redi-Carpet apparently operated that flight noncommercially, through Capital, for its own use under part 91. Boeta, as Capital's employee and agent, was presumably to pilot it as Redi-Carpet's agent.

Before commencing the flight to Palm Beach, Boeta filed a flight plan with the FAA. On it, he indicated that N497RC's operator was authorized to use N497RC in RVSM airspace, and he proceeded to pilot the subject flight in RVSM airspace.

We can only speculate that, for reasons of its own, USAC might have alerted the FAA to N497RC's unauthorized flight in RVSM airspace: It cannot be purely coincidental that, when Boeta landed N497RC at Palm Beach, the aircraft was met by FAA inspectors who performed a "ramp check." They asked Boeta to verify that the operator had authorization for N497RC to be flown in RVSM airspace. Boeta initially told the inspectors that the flight had been operated under part 91, prompting the inspectors to ask to see the owner's LOA authorizing it to operate in RVSM airspace. Boeta returned to the aircraft and "searched for sometime" before calling Capital to fax him a copy of the LOA. Instead, Capital faxed a copy of USAC's unamended OpSpecs. Boeta then told

6

the inspectors that he had misspoken; that the flight had actually been operated under part 135, not part 91.

The inspectors then asked to see the operator's OpSpecs. Boeta gave them USAC's outdated OpSpecs, which indicated that USAC was authorized to operate N497RC in RVSM airspace. The inspectors, however, had procured USAC's current OpSpecs from a FAA database. (At the ALJ hearing, the inspectors noted that, if they had not been aware that USAC's current OpSpecs existed, the outdated OpSpecs that Boeta presented would have been valid.)

Within ten days following the subject flight, Boeta filed a voluntary Aviation Safety Report ("ASR") under the FAA's Aviation Safety Reporting System. More about this later.

B.

The FAA suspended Boeta's air transport pilot certificate for a period of sixty days. The suspension order stated that Boeta had violated 14 C.F.R. part 91, appendix G, section (4)(b)(1), and 14 C.F.R. § 91.180(a)(1), which prohibit anyone from either filing a flight plan for, or operating a flight in, RVSM airspace unless the aircraft's *operator* is authorized to do so by the FAA. The suspension order stated that Boeta, as pilot-in-command, had filed a flight plan for and operated the flight of N497RC in RVSM, even though no operator was authorized to do so at the time.

Boeta appealed the FAA's order of suspension and, after a hearing, the ALJ upheld the FAA's order in an "initial decision." Boeta appealed the ALJ's decision to the National Transportation Safety Board ("NTSB") which issued a "final decision" affirming the ALJ. Boeta now appeals the NTSB's final decision. In this appeal, he asserts that the NTSB's erred in ruling that the ALJ (1) properly limited Boeta's cross-examination of several witnesses, (2) properly rejected Boeta's defense of reasonable reliance, and (3) properly

No. 15-60431

rejected Boeta's request for a waiver of sanction under the FAA's ASR procedure.

## II.

### A.

We must uphold a decision of the NTSB unless it is "unsupported by substantial evidence" or is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[12] The NTSB's findings of fact, "if supported by substantial evidence, are conclusive."[13] Substantial evidence is "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[14] There is a "very narrow window of appellate scrutiny" for an ALJ's credibility assessment.[15] "[A] determination of credibility is non-reviewable unless there is uncontrovertible documentary evidence or physical fact which contradicts it."[16] We review *de novo* the NTSB's resolution of purely legal questions.[17]

We have reviewed the record on appeal, the briefs of the parties as supplemented and explained by counsel at oral argument, and the multi-level considerations of Boeta's claims by the FAA, the ALJ, and the NTSB, and we have done so in the framework of Chevron deference and the highly deferential

---

[12] 5 U.S.C. § 706(2)(A),(E); *see Miranda v. Nat'l Transp. Safety Bd.*, 866 F.2d 805, 807 (5th Cir. 1989).

[13] 49 U.S.C. §§ 1153(b)(3), 46110(c).

[14] *Ellis v. Liberty Life Assur. Co. of Bos.*, 394 F.3d 262, 273 (5th Cir. 2004).

[15] *Miranda*, 866 F.2d at 807.

[16] *Id.*

[17] *See Kratt v. Garvey*, 342 F.3d 475, 480 (6th Cir. 2003) (collecting cases); *cf. Pool Co. v. Cooper*, 274 F.3d 173, 177 (5th Cir. 2001).

abuse-of-discretion, substantial evidence, and arbitrary-and-capricious standards by which our appellate consideration is cabined. This review leads us to conclude that the NTSB did not err reversibly in rejecting (1) Boeta's assertion that the ALJ improperly limited his cross-examination of several witnesses and (2) his affirmative defense of reasonable reliance. We therefore affirm those determinations and turn to the NTSB's denial of Boeta's claim that he is nevertheless entitled to a waiver of sanctions under the ASR procedure.

## B.

## 1.

Boeta insists that it was arbitrary and capricious for the NTSB to affirm the ALJ's rejection of his affirmative defense of waiver of sanction. He asserts that any violation of the regulations was inadvertent and not deliberate on his part, entitling him to a waiver of sanctions, given his timely reporting of the incident to NASA pursuant to the FAA's ASR procedure.

The FAA instituted the ASR procedure in 1975, with the goal of encouraging the "identification and reporting of deficiencies and discrepancies in the system."[18] To ensure the pilot's anonymity, the FAA has an ASR received by and processed through NASA, a neutral third party.[19] NASA reports the ASR to the FAA, but does so without identifying the pilot who filed it. (Here, the FAA was already aware of Boeta's violation by virtue of the ramp check.)

"The FAA considers the filing of a report with NASA concerning an incident or occurrence involving a violation of . . . the 14 CFR to be indicative

---

[18] Aviation Safety Reporting Program, FAA Advisory Circular No. 00-46E (2011).

[19] *Id.*

of a constructive attitude" that "will tend to prevent future violations."[20] "[A]lthough a finding of violation may be made" after a pilot voluntarily submits an ASR, "neither a civil penalty nor certificate suspension will be imposed" if (1) the violation was "inadvertent and not deliberate," (2) the violation did not involve a criminal offense, an accident, or action showing a lack of qualification or competency, (3) the pilot has not committed a similar violation within the previous five years, and (4) the pilot can prove that he filed the ASR within ten days of the violation.[21] Here, the parties dispute only whether Boeta's violation was *inadvertent*.[22]

2.

"Inadvertent" is neither a technical legal term nor a FAA term of art. Rather, it is a "plain vanilla" English adjective and must be interpreted here as such. According to the *New Shorter Oxford English Dictionary*, "inadvertent" means unintentional when modifying an action.[23] It is defined variously as "not duly attentive" and "accidental; unintentional" in the *American Heritage Dictionary of the English Language*.[24] Inadvertent is not defined in *Black's Law Dictionary*, but "inadvertence" is defined there as "an accidental oversight; a result of carelessness."[25]

---

[20] *Id.*

[21] *Id.*

[22] The parties agree that the violation was "not deliberate," but for immunity to apply, a pilot must establish that his actions were both not deliberate *and* inadvertent. *See* Adm'r v. Ricotta, NTSB Order No. EA-5593, at *2 (2011); *Ferguson v. Nat'l Transp. Safety Bd.*, 678 F.2d 821, 828 (9th Cir. 1982).

[23] *Inadvertent*, NEW SHORTER OXFORD ENGLISH DICTIONARY (1993).

[24] *Inadvertent*, AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (1976).

[25] *Inadvertence*, BLACK'S LAW DICTIONARY (10th ed. 2014).

No. 15-60431

The United States Court of Appeals for the Ninth Circuit has stated that, in this context, "an inadvertent act is one that is not the result of a purposeful choice."[26] It illustrated this principle with two examples:

> [A] person who turns suddenly and spills a cup of coffee has acted inadvertently. On the other hand, a person who places a coffee cup precariously on the edge of a table has engaged in purposeful behavior. Even though the person may not deliberately intend the coffee to spill, the conduct is not inadvertent because it involves a purposeful choice between two acts—placing the cup on the edge of the table or balancing it so that it will not spill. Likewise, a pilot acts inadvertently when he flies at an incorrect altitude because he misreads his instruments. But his actions are not inadvertent if he engages in the same conduct because he chooses not to consult his instruments to verify his altitude.[27]

We conclude that whether an act—or, as here, an omission or failure to act—is "inadvertent" depends on the exact nature of the act or omission in question and the discrete facts and details of the situation. We now explain briefly our conclusion that Boeta's failure to determine, immediately before the subject flight, whether N497RC remained eligible for operation in RVSM airspace was inadvertent for purposes of the waiver of sanction under the ASR procedure.

Here, the NTSB affirmed the ALJ's determination that Boeta's violation was not inadvertent. The ALJ reasoned that Boeta, as the pilot in command, had an obligation (1) to review the OpSpecs or LOA immediately before each flight and (2) to ensure that either an OpSpecs or LOA was actually in the

---

[26] *Ferguson*, 678 F.2d at 828.

[27] *Id.*

11

aircraft during each flight. Had he done so, Boeta would have become aware of the change in RVSM authorization. The ALJ decided that Boeta's failure to perform these tasks constituted an intervening circumstance that made his otherwise inadvertent conduct advertent:

> [An FAA inspector] testified that it is the responsibility of the pilot-in-command to ensure that all required documents are current and on board the aircraft before each flight. If a flight involves a flight in RVSM airspace, an RVSM authorization must be on board the aircraft, and the pilot-in-command has to review that document to determine whether or not it is current. The conduct of [Boeta] during the ramp check . . . and his interactions with . . . [the FAA inspectors] indicate he did not know where the proper RVSM documentation was located because he had not checked on the RVS compliance for his aircraft before the flight. . . . [Another FAA inspector] testified he thought [Boeta] provided a portion of the RVSM maintenance manual under the belief that the document constituted an RVSM authorization. [Boeta] did not dispute that testimony, and [Boeta]'s conduct during the ramp check does not convince me or establish that his violation . . . was inadvertent.

The NTSB likewise indicated:

> [Boeta]'s failure to verify RVSM compliance prior to take off was not inadvertent, as respondent chose not to check the status of N497RC's RVSM authorization prior to the September 8, 2011 flight.

Again, the ALJ's and the NTSB's decisions that Boeta's violation was not inadvertent focused *only* on (1) Boeta's failure to review either an OpSpecs or LOA *immediately before* each flight in RVSM airspace, and (2) his failure to

ensure that such an OpSpecs or LOA was *physically in the aircraft* during the flight. It did not consider any other surrounding circumstances.[28]

These reasons, however, do not withstand scrutiny. As we discuss below, the ALJ and NTSB erred in their determination that Boeta had an obligation (1) to review any OpSpecs or LOA before each flight or (2) to ensure such a OpSpecs or LOA was in the aircraft during each flight. Without any intervening obligation to perform either of those tasks, during which Boeta would have become aware of the change in the RVSM authorization, his conduct would remain inadvertent.

In reaching its decision, the ALJ noted that an FAA inspector stated at the hearing that the pilot is always responsible for verifying that an operator is authorized for RVSM operations by actually consulting the authorization in an operator's OpSpecs or LOA. Even though this assertion was made on the basis of the inspector's personal, not expert, knowledge, the ALJ cited it in determining that Boeta, as the pilot in command, had such a responsibility. The ALJ, however, did not cite any other source for this responsibility.

If such an obligation existed, it would likely have been included within the regulations that enumerate the authorizations a pilot in command must consult before each flight. But such an obligation does not appear in these regulations.[29] To the contrary, in its advisory circular supplying the RVSM

---

[28] Judge Higginson, in his dissent, suggests that we also consider whether "Boeta ignored surrounding circumstances of the invalidity of the flight's RVSM authorization." This would require us to do what he warns against. As he notes, "review of NTSB decisions is circumscribed and highly deferential."

[29] *See*, *e.g.*, 14 C.F.R. § 91.9(b) ("No person may operate a U.S.-registered civil aircraft . . . unless there is available in the aircraft a current, approved Airplane or Rotorcraft Flight Manual . . . ."); 14. C.F.R. § 91.103 ("Each pilot in command shall, before beginning a flight, become familiar with all available information concerning that flight [including] weather reports and forecasts, fuel requirements, alternatives available if the planned flight cannot be completed, and any known traffic delays of which the pilot in

operating practices and procedures, the FAA states that a pilot must "verif[y] that the *aircraft* is approved for RVSM operations," but does not state that the pilot must verify that the *operator* is authorized for such operations.[30] By its own assertion, this circular, "describes an acceptable means . . . for authorization of aircraft and operators to conduct flight in airspace or on routes where RVSM is applied."[31] Like the regulations, this circular does not require that the pilot actually consult any LOA or OpSpecs immediately before operating in RVSM airspace.[32]

The regulations also make it clear that a pilot, once aware that the authorization exists in the operator's OpSpecs, has no ongoing obligation to confirm that it remains current and therefore valid. Instead, 14 C.F.R. § 119.43, which applies to part 135 commercial operators like USAC,[33] states that the *operator* is responsible for "keep[ing] each of its employees and other persons used in its operations informed of the provisions of its [OpSpecs] that apply to that employee's or person's duties and responsibilities."[34] The pilot is

---

command has been advised by ATC . . . ."); 14 C.F.R. § 91.203 ("[N]o person may operate a civil aircraft unless it has within it . . . [a]n appropriate and current airworthiness certificate . . . [and a]n effective U.S. registration certificate . . . ."); 14 C.F.R. § 91.503 ("The pilot in command of an airplane shall ensure that the following flying equipment and aeronautical charts and data, in current and appropriate form, are accessible for each flight at the pilot station of the airplane: . . . [a] cockpit checklist containing the procedures[,] . . . [p]ertinent aeronautical charts[, and] . . . each pertinent navigational en route, terminal area, and approach and letdown chart."); *see* 14 C.F.R. § 23.1589.

[30] Authorization of Aircraft and Operators for Flight in Reduced Vertical Separation Minimum Airspace, FAA Advisory Circular No. 91-85.

[31] *Id.*

[32] It also raises a question as to whether the pilot even needs to verify that the operator is authorized.

[33] 14 C.F.R. § 119.1; 14 C.F.R. § 119.5.

[34] 14 C.F.R. § 119.43(c).

not responsible for keeping himself informed. He must rely on the operator for the current OpSpecs.

It is undisputed that Boeta had, at some earlier point, consulted the authorization in USAC's outdated OpSpecs. USAC issued Boeta its "operations manuals," which included its then-current OpSpecs.[35] He was certainly aware that, at some point, USAC's outdated OpSpecs permitted him to pilot N497RC in RVSM airspace. The ALJ's determinations, as affirmed by the NTSB, bolster this.

It is generally understood that an existing condition is presumed to continue in existence, absent some indication that it has ceased or substantially changed.[36] When USAC terminated its agreement with USAC, its chief pilot called Boeta several times, but Boeta did not answer or return his calls.[37] By the chief pilot's account, USAC never terminated its agency relationship with Boeta. The chief pilot conceded as much at the ALJ's hearing. Accordingly, Boeta remained USAC's agent even after the agreement between USAC and Capital concluded. As a result, USAC had a continuing obligation

---

[35] USAC trained Boeta to operate in RVSM airspace and an FAA inspector tested him on his knowledge and ability in that regard. Additionally, Boeta was aboard N497RC during USAC's proving runs, when an FAA inspector tested its capability.

[36] *Cent. Pac. Ry. Co. v. Alameda Cty., Cal.*, 284 U.S. 463, 468 (1932) (noting "the general principle that a condition once shown to exist is presumed to continue."); *see* 31A C.J.S. *Evidence* § 216 ("Proof of the existence at a particular time of a fact or condition of a continuous nature gives rise to an inference, within logical limits, that it exists at a subsequent time."); *see e.g.*, *Swift & Co. v. United States*, 343 U.S. 373, 382-83 (1952); *Lewis v. Hawkins*, 90 U.S. 119, 126 (1874); *Mitchell v. United States*, 88 U.S. 350, 353 (1874); *In re Baigorry*, 69 U.S. 474, 480 (1864). *But see Maggio v. Zeitz*, 333 U.S. 56, 65 (1948) ("Language can, of course, be gleaned from judicial pronouncements and texts that conditions once existing may be presumed to continue until they are shown to have changed. But such generalizations, useful enough, perhaps, in solving some problem of a particular case, are not rules of law to be applied to all cases, with or without reason.").

[37] Boeta disputed this, stating that the chief pilot had never called him. The ALJ, however, credited the chief pilot's account, and we do not disrupt this determination.

to keep Boeta informed of the changes in its OpSpecs that applied to his duties and responsibilities as a pilot.[38] This obligation would not have existed had USAC simply terminated its agency relationship, which it might have accomplished by sending written notice to Boeta at the address on his application to USAC or even the address in the FAA's registry.[39]

As the NTSB itself noted, an FAA inspector stated that "without more, someone reading the [USAC's outdated] OpSpecs . . . would conclude N497RC was still approved for RVSM operations."[40] There is no indication in the record that USAC—nor Capital or Redi-Carpet, for that matter—expressly informed Boeta that he was relying on outdated OpSpecs. As far as Boeta was concerned, nothing had changed with regard to him, to any of those entities, or to N497RC itself.[41] The authorization contained in USAC's outdated OpSpecs, would have allowed USAC to operate N497RC commercially for Redi-Carpet's benefit under part 135, provided that USAC's dry lease was still in effect. Alternatively, that authorization would have allowed USAC to operate N497RC noncommercially for Redi-Carpet's benefit under part 91, even after the dry lease had ended. As the FAA states, "[o]perators issued OpSpecs are not required to also obtain an LOA for those operations when they are

---

[38] *See* 14 C.F.R. § 119.43(c).

[39] *See* AIRMAN INQUIRY, FEDERAL AVIATION ADMINISTRATION, https://amsrvs.registry.faa.gov/airmeninquiry/.

[40] Even so, the NTSB disregarded this, remarking that the same inspector stated that "a pilot would have had other methods, in addition to the OpSpecs, available to determine if an aircraft was authorized for RVSM operations." Certainly, however, the regulations and circular do not require a pilot to do more than review the authorization itself.

[41] Although Boeta's violation was inadvertent and therefore excused by the waiver-of-sanction defense, it was not excused by the reasonable reliance defense because, in part, he had "reason to question" USAC's silence.

conducted under part 91, provided that," among other things, "[t]he aircraft is operated under the operator name listed on the OpSpecs."[42] The absence of USAC's dispatch sheet was Boeta's only indication that USAC might not be operating the flight.

USAC, Capital, and Redi-Carpet were in much better positions to determine who had possession of and operational control over N497RC. Boeta was largely ignorant of the shifts in those entities' respective relationships. Although Boeta might have done more to inquire of them, they certainly should have done more to inform him of how those shifts affected his authority to operate N497RC for them.

More to the point, USAC, which had an obligation to inform Boeta of changes to its OpSpecs, should not have merely assumed that Boeta would notice the distinction between its dispatch sheet and Capital's trip sheet. Boeta understood that USAC was consulting with Capital on obtaining its certificate under part 119, and he must have understood that at some point USAC would transfer operational control from itself to Capital to allow that process to occur. USAC should have provided clear and unambiguous notice to Boeta. We can only speculate that USAC's motive is not so informing Boeta was its quarrel with Capital, which remained Boeta's employer throughout.

Boeta urges that *Administrator v. Meacham*[43] supports the conclusion that his conduct was inadvertent. In *Meacham*, an aircraft ran out of fuel four miles from its destination after the pilot failed to check the fuel levels in each

---

[42] Authorization of Aircraft and Operators for Flight in Reduced Vertical Separation Minimum Airspace; FAA Advisory Circular No. 91-85.

[43] Garvey v. Meacham, NTSB Order No. EA-4633 (1998).

tank visually before the flight.[44] When the aircraft ran out of fuel, the gauges showed the fuel level in one tank was empty and the other was almost full. The NTSB determined that the pilot's failure to check the tanks was at least partly justified by the circumstances. The pilot had been the last person to refuel the aircraft, knew how much fuel had been added, knew how long he had flown the aircraft, and knew that one of the fuel gauges was inoperative.[45] The NTSB also suggested that the reason the fuel level was low might have been because someone siphoned it.[46]

Any difference between Boeta's failure to reinspect the RVSM authorization and the *Meacham* pilot's failure to reinspect the fuel level did not rise to the level of a distinction. Any inadvertence was the result of, at least in part, the improper acts or omissions of others. Like the pilot in *Meacham*, Boeta inadvertently relied on what he understood to be an unchanged condition. He is entitled to the waiver-of-sanction defense under the provisions of the FAA's ASR procedure.

Although we are aware of the danger posed by unauthorized RVSM flight, we are also cognizant of the need, recognized by Congress, for pilots to freely disclose violations to the FAA. Such disclosure allows the FAA to resolve problems before they result in accidents. Pilots will be less likely to participate if, after complying with the ASR procedure, they are not afforded the promised protections. Boeta's violation was *malum prohibitum*, not *malum in se*: He knew that he was adequately trained, and that N497RC was adequately

---

[44] *Id.*

[45] *Id.*

[46] *Id.*

equipped, to operate safely in RVSM airspace, but he was mistaken in believing that they were permitted to do so on the date of the flight in question.

### III.

We are no less sensitive to air safety concerns than the FAA, the ALJ, and the NTSB. But candidly, it defies common sense to conclude that Beota was anything but inadvertent when he, as a pilot capable of flying in restricted airspace, flew an airplane capable of flying in restricted airspace, without checking the *paperwork* evidencing that the *operator* (not the pilot!) of that craft was still authorized to commission such flights. This is especially so when viewed in the context of the agencies' conclusion that the pilot in *Meacham*— who "forgot" to check his fuel level before taking off, with the potential of causing a true disaster (not merely a paperwork glitch)—was inadvertent.

For the forgoing reasons, we hold that the NTSB's decision affirming the ALJ's rejection of Boeta's defense of waiver of sanction under the ASR procedure was arbitrary and capricious as a matter of law. We therefore REVERSE those rulings and RENDER judgment that Boeta is entitled to waiver of all sanctions—expressly including the sixty days suspension of his air transport pilot certificate—by virtue of his timely compliance with the FAA's ASR procedure; and we REMAND this matter to the NTSB with instructions to expunge its suspension of Boeta's said certificate and to take any other steps that might be required to complete these proceedings, consistent with the opinion.

REVERSED, RENDERED, and REMANDED with instructions.

STEPHEN A. HIGGINSON, Circuit Judge, dissenting:

I write separately to concur in large part but dissent in small part, because I agree with the majority that the National Transportation Safety Board ("NTSB") did not err reversibly in rejecting (1) Boeta's assertion that the administrative law judge ("ALJ") improperly limited his cross-examination of several witnesses and (2) his affirmative defense of reasonable reliance. I respectfully dissent, however, from the majority's reversal of the NTSB's decision affirming the ALJ's determination that Boeta was not entitled to a waiver of sanction. The Federal Aviation Administration ("FAA") sanction was upheld after two evidentiary hearings before the ALJ, spanning three days in total, and then again on appeal by the NTSB. I do not perceive the NTSB's rulings to be arbitrary and capricious and believe its factual findings are consistent with the record. For these reasons, and because the NTSB's findings of fact as to pilot safety requirements have such importance and sensitivity, I would not disturb Boeta's sixty-day pilot suspension.

Under this court's precedent, appellate review of NTSB decisions is circumscribed and highly deferential. *See Miranda v. Nat'l Transp. Safety Bd.*, 866 F.2d 805, 807 (5th Cir. 1989); *Tokoph v. Blakey*, 73 F. App'x 772, 773 (5th Cir. 2002) ("We accord substantial deference to the NTSB's interpretation of the statutes and regulations it administers."). We must uphold a decision of the NTSB unless it is "unsupported by substantial evidence" or is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A),(E); *see Miranda*, 866 F.2d at 807; *Harris v. Hinson*, No. 96-60670, 1997 WL 156807, at *1 (5th Cir. Mar. 19, 1997) (unpublished).

The NTSB was correct to affirm the ALJ's finding that Boeta's violation was not inadvertent. It is undisputed that Boeta flew in Reduced Vertical Separation Minimum ("RVSM") airspace without the required authorization.

The ALJ, the factfinder tasked with hearing live testimony, including Boeta's, for a total of three days, discredited Boeta's claim that his violation occurred because he had misplaced his trust in Capital Aerospace, LLC ("Capital"), and that individuals at Capital had lied to him by telling him on multiple occasions that the aircraft's RVSM authorization was still valid. The ALJ additionally did not find credible or logical Boeta's claim that the outdated Operations Specifications ("OpSpecs") were on board the aircraft on September 8.[1]

The ALJ instead credited the testimony of FAA inspectors who were present during the ramp check and found that Boeta's interactions with them demonstrated that he "did not know where the proper RVSM documentation was located because he had not checked on the RVSM compliance for his aircraft before the flight." Although Boeta initially told the inspectors that his flight was conducted under 14 C.F.R. Part 91, he later insisted that he misspoke and that the flight was conducted under 14 C.F.R. Part 135.[2] This distinction is important, because, as Boeta later testified, he knew that if USAC did not dispatch a particular flight, the aircraft could not be flown under Part 135 in reliance upon USAC's OpSpecs, which were the basis of the

---

[1] There is a "very narrow window of appellate scrutiny" for an ALJ's credibility assessment. *Miranda*, 866 F.2d at 807. "[A] determination of credibility is non-reviewable unless there is uncontrovertible documentary evidence or physical fact which contradicts it." *Id.* (quoting *N.L.R.B. v. J.M. Machinery Corp.*, 410 F.2d 587, 590 (5th Cir. 1969)).

[2] As the majority discusses, flights operated under Part 135 are commercial in nature, while flights operated under Part 91 are non-commercial and are operated by the owner or lessee. Although the record reflects some contradiction regarding whether Boeta actually believed the September 8 flight was operated under Part 135 or Part 91, he indicated in his response to the FAA's letter of investigation that the flight was operated under Part 135. Regardless, the ALJ credited testimony that both Part 91 and Part 135 flights conducted under USAC's Part 135 certificate would be required to be dispatched and operated by USAC.

No. 15-60431

aircraft's RVSM authorization.  He also testified that he understood that the flight was not dispatched by or under the operational control of USAC.[3]

The ALJ credited additional testimony of Michael Ohannesian, one of the FAA Inspectors who examined the out-of-date USAC OpSpecs presented by Boeta on the day of the ramp check.  Ohannesian testified that, by its terms, the OpSpecs were for the exclusive use of USAC and that the RVSM authorization could not be used unless USAC had operational control of the flight. In other words, according to the testimony heard by the ALJ, the OpSpecs relied upon by Boeta only authorized *USAC* to operate the aircraft in RVSM airspace, regardless of whether or not those OpSpecs were current or outdated.  Importantly, the NTSB ultimately found that Boeta had reason to question whether the aircraft's prior RVSM authorization was valid because he "was aware [that] USAC did not dispatch the flight and [that] the flight was not under the operational control of USAC."  Moreover, the ALJ credited FAA Inspector Charles McKinley's testimony that the pilot in command is responsible for ensuring that all required documents are current before making a flight, which would include ensuring that RVSM authorization is current before making a flight in RVSM airspace.

These factual determinations are supported by "more than a scintilla" of relevant evidence such that "a reasonable mind might accept [the evidence] as adequate" to support the NTSB's conclusion and thus satisfy the deferential

---

[3] The majority questions how Boeta could have known that the aircraft was not under the operational control of USAC.  However, Boeta himself testified that the aircraft was under the operational control of Redi-Carpet, not USAC. *See Huerta v. Boeta*, NTSB-ALJ Order No. SE-19349, at 442.  Additionally, the ALJ credited testimony that Boeta received training regarding operational control of the aircraft and the importance of the aircraft being dispatched by USAC, regardless of whether the flight was conducted under Part 91 or Part 135.  *Id* at 429, 433.  Moreover, the majority acknowledges that, according to Boeta's own testimony, he knew the September 8 dispatch sheet did not come from USAC.  This confirmed that the flight was not under USAC's operational control.

22

"substantial evidence" standard. *See Ellis v. Liberty Life Assur. Co. of Bos.*, 394 F.3d 262, 273 (5th Cir. 2004) (quoting *Deters v. Sec'y of Health, Educ. & Welfare*, 789 F.2d 1181, 1185 (5th Cir. 1986)). Further, these factual findings support the ALJ's ultimate conclusion that Boeta's violation was not inadvertent because the evidence established that he "did not determine if his aircraft was RVSM compliant before he flew in RVSM airspace, where jets fly at high speed at reduced vertical separation; he simply did not check." The NTSB upheld the ALJ on these factual findings and likewise held that Boeta's violation did not qualify as inadvertent, because he "chose not to check" the RVSM authorization before the September 8 flight, despite having good reason to question whether the RVSM authorization he relied upon was valid.

Unlike the majority, I believe this NTSB conclusion is consistent with *Ferguson v. National Transportation Safety Board*, 678 F.2d 821 (9th Cir. 1982), in which the United States Court of Appeals for the Ninth Circuit defined an "inadvertent act" as "one that is not the result of a purposeful choice." *Id.* at 828. One could reasonably conclude that Boeta's failure to check on the RVSM status when he had good reason to question its validity for the September 8 flight is akin to the Ninth Circuit's example of a "purposeful choice" to place a cup of coffee on a precarious table edge. *Id.* Likewise, Boeta's choice not to check on the RVSM status at all may reasonably be viewed like the Ninth Circuit's example of a pilot who flies at an incorrect altitude after choosing not to consult his instruments to verify his altitude. *Id.*

Moreover, the ALJ's finding that the surrounding circumstances of the September 8 flight should have alerted Boeta that the flight was not RVSM authorized distinguishes the instant case from *Administrator v. Meachum*, NTSB Order No. EA-4633 (1998). In *Meachum*, the NTSB concluded that a pilot's failure to check his aircraft's fuel tanks prior to a flight was justified by

23

the surrounding circumstances, which gave the pilot no reason to suspect that the fuel level was lower than he believed it to be.[4]  *Id.*  This is in contrast to the red flags found to exist in Boeta's case.  Again, Boeta was aware that USAC neither dispatched nor operated the September 8 flight, that USAC had not dispatched a Capital flight in six months, and that he was not permitted to conduct a flight under USAC's Part 135 OpSpecs unless the flight was dispatched by USAC.  Boeta was also aware that Capitol did not hold any form of RVSM authorization itself.

The NTSB's interpretation is additionally consistent with its past decisions distinguishing a pilot "claim[ing] ignorance of the regulations" at the time of a violation from a pilot who was aware of the regulations at the time of the violation, but "believed, albeit mistakenly, that he was acting in compliance" with them.  *See Administrator v. Halbert*, NTSB Order No. EA-3628 (1992); *Administrator v. McKenna*, NTSB Order No. EA-3960 (1993).  In these decisions, the NTSB clarified that the latter violation qualifies as inadvertent, but the former does not, because, while the pilot "did not purposefully violate the [Federal Aviation Regulations], neither did he make any attempt to comply[.]"  *McKenna*, NTSB Order No. EA-3960, at *4.  While the majority credits some of Boeta's testimony to support his claim that he was aware of the requirements and merely mistakenly believed his September 8 flight was in compliance with them, the factfinder who heard Boeta's testimony and cross-examination over the course of two days specifically discredited that

---

[4] The circumstances in *Meachum* were highly unusual.  In that case, the pilot had been the last person to fuel the aircraft, knew how much fuel he had put in, knew how long he had flown the aircraft, and knew that the left fuel gauge was not working properly.  *Meachum*, NTSB Order No. EA-4633, at *1.  The NTSB also suggested that the reason the fuel was low might have been because someone siphoned it, a possibility that understandably might not occur to a pilot.  *Id.* at *2.

testimony, and there was factual support in the record for the NTSB to infer instead an actual ignorance of the applicable regulations, and, as a result, no attempt on Boeta's part to comply with those regulations. Specifically, Boeta testified, and the ALJ and NTSB found, that Boeta *knew* that USAC did not dispatch or operate the September 8 flight. In fact, he was aware that USAC had not dispatched a Capital flight in six months. These facts can reasonably be understood to demonstrate that, because he at no time questioned how USAC's RVSM authorization could apply to a flight that USAC did not dispatch or operate, Boeta lacked an understanding of the requirements of 14 C.F.R. § 91.180 and 14 C.F.R. § 91, App. G, which are explicit that both the aircraft and *the operator* must be approved for RVSM authorization, rather than a mere mistaken belief that his September 8 flight somehow complied with those regulations. These facts also support the inference that Boeta was not familiar with the content of the OpSpecs upon which he purportedly relied, as those OpSpecs only provided for RVSM authorization if USAC had operational control of the flight.[5]

To summarize, yet I hope not to oversimplify, three factual points (none of which is disputed by the majority or Boeta) provide substantial evidence for

---

[5] Although the majority focuses on whether USAC and Capital provided Boeta with notice that their relationship had ended and that, as a result, the aircraft was no longer listed on USAC's OpSpecs, The question of inadvertence does not require us to make our own findings of fact on that point. Nor is it necessary for us to determine, based on our own judgment, whether a pilot should be expected to verify that valid RVSM authorization documents are on board every flight even if the pilot has no reason to suspect that prior RVSM authorization may no longer be valid. Regardless, the ALJ credited testimony from both a USAC employee and a Capitol employee indicating that pilots at Capital knew that the relationship between the two companies had ceased to exist, and I would defer to the ALJ's determinations of witness credibility. The ALJ additionally credited FAA testimony that pilots flying in RVSM airspace must check RVSM documents to confirm they are up-to-date and on board a flight. On that point in particular, we should defer to the ALJ's determination of witness credibility, because pilot safety is of such complexity and importance.

the conclusion that Boeta's actions did not qualify as inadvertent. First, Boeta testified that his mistaken belief that the September 8 flight had valid RVSM authorization was based on the out-of-date USAC OpSpecs that he presented to FAA inspectors following his September 8 flight. Second, those out-of-date OpSpecs provided that USAC's RVSM authorization could not be used unless USAC had operational control of the flight, and Boeta knew that when USAC did not dispatch a flight, the aircraft could not be operated under Part 135. Finally, and most importantly, Boeta knew that USAC did not dispatch or have operational control of the September 8 flight, which he insisted to inspectors was conducted under Part 135. In fact, Boeta was well aware that USAC had not dispatched a single Capital flight in six months and had himself flown flights for Capital in the interim. Based on these facts alone, substantial evidence supported the finding that Boeta ignored surrounding circumstances of the invalidity of the flight's RVSM authorization, which the relevant Federal Aviation Regulations make clear is *operator*-specific. Under this reasonable view of the record, read in light of the precedent discussed above, it was not arbitrary and capricious to conclude that Boeta's violation did not qualify as inadvertent and that a waiver of violation was therefore not justified. Hence, I would AFFIRM the NTSB's order in its entirety.

26